**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

JAMES O'DOAN,
*Plaintiff-Appellant*,

v.

JOSHUA SANFORD, Reno Police
Officer; CADE LEAVITT, Reno Police
Officer; CITY OF RENO,
*Defendants-Appellees.*

No. 19-15623

D.C. No.
3:17-cv-00293-
LRH-CBC

OPINION

Appeal from the United States District Court
for the District of Nevada
Larry R. Hicks, District Judge, Presiding

Submitted May 15, 2020*
San Francisco, California

Filed March 19, 2021

Before: Ryan D. Nelson and Daniel A. Bress, Circuit
Judges, and Frederic Block,** District Judge.

Opinion by Judge Bress;
Dissent by Judge Block

---

\* The panel unanimously concludes this case is suitable for decision
without oral argument. *See* Fed. R. App. P. 34(a)(2).

\*\* The Honorable Frederic Block, United States District Judge for
the Eastern District of New York, sitting by designation.

## SUMMARY[***]

---

### Civil Rights

The panel affirmed the district court's summary judgment for defendants in an action brought pursuant to 42 U.S.C. § 1983 and the Americans with Disabilities Act alleging that police officers used excessive force against plaintiff, lacked probable cause to arrest him, and prepared deliberately fabricated police reports.

Police officers responded to a 911 call reporting that plaintiff had experienced an epileptic seizure, was trying to break windows, and had fled his home naked. In apprehending plaintiff on a sidewalk after he refused to comply with commands to stop, officers struggled physically with plaintiff and used a "reverse reap throw" to bring plaintiff to the ground. Plaintiff was transported to the hospital and, after being treated and discharged, he was released into police custody and charged with indecent exposure and resisting a police officer. Plaintiff was booked into the county jail overnight and released on bail the next day. Charges were later dismissed.

The panel held that plaintiff's § 1983 claims failed because the police officers were entitled to qualified immunity. Addressing first the claim that the use of the reverse reap throw amounted to excessive force, the panel evaluated the facts of this case against the applicable body of Fourth Amendment law, and concluded, at the very least,

---

[***] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

that Officer Sanford did not violate clearly established law when he executed the maneuver on plaintiff. The panel noted that officers were called in to a "Code 3" situation, a request for immediate police assistance for a "violent" individual. They arrived to find plaintiff naked and moving quickly on a busy street. Plaintiff repeatedly resisted officers' commands to stop and then turned to the officers in a threatening manner, with his fists clenched. Plaintiff identified no precedent that would suggest the force used here was excessive, much less that excessiveness was clearly established on these facts.

The panel held that the district court correctly granted summary judgment on plaintiff's Americans with Disabilities Act ("ADA") claim that officers failed to make a reasonable accommodation when detaining him. The panel held that plaintiff had not shown that a lesser amount of force would have been reasonable under the circumstances, or how personnel with different training would have acted differently given the exigencies of the situation.

Addressing plaintiff's unlawful arrest claim, the panel could not say that the officers violated clearly established law in determining they had probable cause to arrest plaintiff after witnessing him engage in conduct that indisputably violated Nevada law. Nor did any clearly established law require the officers to conclude that probable cause had dissipated once plaintiff was discharged from the hospital. Nothing that happened in the emergency room could or did change the fact that plaintiff had, without doubt, engaged in illegal conduct—which the officers had personally observed and experienced firsthand. Assuming plaintiff could assert a parallel ADA wrongful arrest claim against the City, that claim likewise failed.

The panel lastly considered plaintiff § 1983 claim that the officers violated due process because they did not discuss plaintiff's reported epileptic seizure in their police report and affidavit supporting probable cause. While the panel could agree that more information is usually better than less and that including more specific information about reports of plaintiff's possible seizure would have been preferable, the question here was whether officers violated clearly established law. The panel concluded that they plainly did not.

Dissenting in part, Judge Block stated that the problem with the majority's opinion was that there were clearly material factual disputes and credibility determinations that were for a jury – not judges – to resolve. Judge Block dissented from those parts of the opinion granting summary judgment for the police officers on plaintiff's § 1983 false arrest and due process claims, as well as on his ADA claim. Judge Block concurred in those parts of the majority's opinion upholding the district court's grant of summary judgment on the excessive force and failure to train claims.

## COUNSEL

Luke Busby, Reno, Nevada, for Plaintiff-Appellant.

Karl S. Hall, City Attorney; Mark W. Dunagan, Deputy City Attorney; City Attorney's Office, Reno, Nevada; for Defendants-Appellees.

**OPINION**

BRESS, Circuit Judge:

James O'Doan was arrested for resisting a public officer and indecent exposure after officers observed O'Doan engage in conduct that violated Nevada law. O'Doan spent one night in custody and was released on bail the next morning. The charges against him were later dropped. O'Doan then filed this lawsuit under 42 U.S.C. § 1983 against Reno police officers Joshua Sanford and Cade Leavitt, alleging they used excessive force, lacked probable cause to arrest him, and prepared deliberately fabricated police reports. O'Doan also brought related claims against the City of Reno under the Americans with Disabilities Act (ADA). *See* 42 U.S.C. § 12101 *et seq.*

We hold that O'Doan's § 1983 claims fail because the police officers were entitled to qualified immunity. We also hold that the district court properly granted summary judgment to the City on O'Doan's related ADA claims. We therefore affirm the judgment of the district court.

I

In reviewing the grant of summary judgment to the defendants, we recite the facts in the light most favorable to O'Doan. *Garcia v. County of Merced*, 639 F.3d 1206, 1208 (9th Cir. 2011).

At 6:47 p.m. on the evening of July 15, 2016, O'Doan's girlfriend, April O'Fria, called 911 to report that O'Doan had experienced an epileptic seizure in the shower, was trying to break windows, and had fled their home naked. The 911 operator informed the emergency dispatcher that "[p]atient is postictal and violent at this time," to which the dispatcher

responded: "All right.  I'll let them know."  Meanwhile, on another 911 call soon after, O'Fria told the operator that O'Doan was having a "very bad epileptic seizure."  The operator responded, "I will let them know."   O'Fria frantically reported that O'Doan was "trying to break out the window" and was "hurting himself very, very bad," before O'Fria was apparently disconnected from the call after approximately two and a half minutes.

On another 911 call less than a minute later, O'Fria further explained that O'Doan "is epileptic and he is having a grand mal seizure" and that police officers had previously "attacked him for not listening."  O'Fria asked the 911 operator to "[p]lease make sure they know he's epileptic." The operator told O'Fria, "So I can't guarantee that the officers, the officers have to do whatever they have to do to keep themselves and everybody else safe, okay?  But I did let them know that he's having a grand mal seizure, okay?" O'Fria then confirmed that "the police have him."   The operator again stated that she will "let the officers know everything."

While these calls were taking place, firefighters had arrived on the scene first and promptly initiated a "Code 3," which means "there's something violent happening" and that police were needed "immediately" for "an emergency situation."  Firefighters had found O'Fria and O'Doan on a busy Reno street "struggling" and "grappling with each other."  O'Doan ran down the street and past the emergency personnel.  O'Doan looked at the firefighters when they tried to talk to him but ignored their requests for him to stop. O'Fria, who had been chasing after O'Doan, told one of the firefighters she believed O'Doan had a seizure and that it had happened before.

In the meantime, police dispatch notified Reno Police Officers Sanford and Leavitt of the Code 3 request. There is no suggestion that the police officers were on O'Fria's 911 calls or the communications between the 911 operator and emergency dispatch, a portion of which took place after police were already engaged. En route to the scene, Officer Sanford saw an EMS advisory on the computer in the police car showing that the 911 caller had reported "that the subj[ect] is in a grand mal seizure [and] last time [officers] attacked him due to him being in a seizure." While Sanford knew what a seizure was, he did not know the meaning of "grand mal seizure." For his part, Officer Leavitt (who was still a police trainee at the time) testified he did not remember reading the EMS advisory on the car computer and was not aware, upon arriving at the scene, that O'Doan had allegedly suffered a seizure.

Sanford and Leavitt pulled up to find that firefighters had "staged" their vehicle away from O'Doan and O'Fria, which is done when there is a law enforcement issue that first requires police intervention. At this point, O'Doan had passed the staged firefighters and was moving quickly down the sidewalk naked.

The officers tried to catch up with O'Doan while identifying themselves as police and instructing O'Doan to stop. O'Doan did not comply. According to Sanford, in response to the officers' commands to stop, O'Doan turned, faced the officers, and "ball[ed] up both of his fists and kind of br[ought] his arms, his forearms, up, not at a full 90-degree angle, but he br[ought] them up slightly." Officer Leavitt similarly described how O'Doan "stopped and turn[ed] towards me with his fist clenched and presenting body language as if he was going to attack myself and Officer Sanford." As Leavitt later testified, O'Doan

"presented towards me like he would have come towards me right there."

Leavitt tried to deploy his taser on O'Doan but the taser malfunctioned.  O'Doan then turned away and moved off quickly.  At that point, Sanford approached O'Doan and used a "reverse reap throw" to bring him to the ground.  This maneuver essentially involves tripping the subject from behind to throw him off balance and then "guiding" him to the ground with both hands.

After Sanford brought O'Doan down, officers engaged in a "major struggle" with O'Doan, who was "combative." O'Doan thrashed around, "scuffl[ing]" with the officers, "kicking and attempting to get up off the ground" and continuing to resist attempts to restrain him.  The officers repeatedly told O'Doan to stop resisting, but O'Doan did not obey.  Firefighters and a third officer who had since arrived on the scene had to help Sanford and Leavitt restrain O'Doan.  After his arms were handcuffed behind his back, O'Doan continued to try to kick people, so officers put leg restraints on him.  O'Doan received some abrasions and lacerations to various parts of his body during the episode.

Once he was restrained, EMS administered a sedative to O'Doan, who began to relax.  O'Doan was then loaded onto a gurney and into the ambulance.  Firefighter David Blondfield informed EMS that O'Fria had told him on the scene that O'Doan had a history of seizures, but Blondfield did not recall EMS's response.  Blondfield did not recall passing on this information to the police officers.  Sanford testified that while still on the scene he spoke with his supervisor, Sergeant Browitt, which is required under department policy when a use of force causes claimed or visible injuries.  Sanford "informed [Browitt] that they're claiming that [O'Doan] was suffering from a seizure."

The emergency personnel at the scene, who had training in responding to persons having seizures, did not believe O'Doan had suffered a seizure or that he was in a "post-ictal" (post-seizure) state. Blondfield testified that, based on what he observed, "a seizure patient was not what came to mind." "[M]y first thought was not this is a seizure. My first thought was there's something else." Instead, O'Doan "reminded me of somebody high on meth or something like that."

Firefighter Trevor Alt similarly testified that emergency personnel "believed [O'Doan] was on drugs." O'Doan's behavior "was consistent with someone that's on a drug binge," "more consistent with methamphetamine, maybe ecstasy, hallucinogens." Blondfield and Alt testified that someone who emerges from a seizure is "lethargic," which is not how O'Doan presented. As Alt testified, "[y]ou can't walk that way in a postictal state."

O'Doan was transported to the hospital to treat his lacerations, and, as Leavitt wrote in his police report, any "other possible health issues." Leavitt testified that because it was "uncommon to have an individual naked running down the street," officers in that type of situation want to ensure persons like O'Doan are "not on any foreign substances to make them mentally not sound there, to make them act in this behavior that isn't common."

Sanford and Leavitt followed O'Doan to the hospital. O'Doan was admitted to the emergency room at 7:40 p.m. that evening. O'Doan has no memory of these events but acknowledged that if he had been left to wander the streets, he could have posed a danger to himself or others.

Once at the emergency room, Dr. Daryl Di Rocco treated O'Doan. Di Rocco's deposition testimony was based entirely on medical records because he did not have any

independent recollection of O'Doan's time at the hospital. The records indicated that O'Doan came in with a "seizure or a possible seizure," and reference O'Doan's "history of seizures," while noting that "[t]he story is not clear." Di Rocco diagnosed O'Doan as having suffered from a seizure, abrasions, and tobacco use, and Di Rocco believed the diagnosis in the records was accurate.

But Dr. Di Rocco confirmed that it was not "clear to [him] from [his] records that [O'Doan] had a seizure on the night in question." Because Di Rocco "didn't see him actually have a seizure," Di Rocco "can't say for sure that's what happened." As Dr. Di Rocco testified, "[p]eople come in with chest pain and I can't feel their chest pain, but I still diagnose them with chest pain if that's what they say they had." While Di Rocco "assume[d]" O'Doan had an epileptic seizure based on his reported medical history, Di Rocco "would not be able to confirm that he had a seizure or that he was in a postictal state. There would be no way for me to know that." Di Rocco thus "couldn't tell you" whether O'Doan was in a post-ictal state during the time he was in contact with the police. Di Rocco also agreed he "did not rule out the fact that Mr. O'Doan may have taken illicit drugs prior to his coming to be treated." Medical records indicate that the next day, during another evaluation, O'Doan tested positive for marijuana.

Officer Leavitt interviewed O'Doan in the hospital. O'Doan informed Leavitt that he believed he had suffered a seizure, but he remembered nothing. Leavitt stated that at the hospital, O'Doan appeared to be in a normal frame of mind, "180 degrees different" from his disposition in the street, and that O'Doan was respectful in their conversation. Leavitt then had a "short conversation" with a doctor at the emergency room "[a]s to does this make sense as to what

Mr. O'Doan is telling me," because Leavitt found O'Doan's behavior "unusual for me, from what I understand a seizure to be." Leavitt's impression of this conversation with the doctor was that "it was – it was no, like this does not match up to what Mr. O'Doan is saying." For his part, Dr. Di Rocco does not remember speaking with the police officers but testified that he would speak with law enforcement "[a]s a matter of routine practice" if officers had questions.

Officer Sanford did not speak with O'Doan at the hospital, but he did receive and sign O'Doan's medical discharge papers, a requirement when a patient is discharged into police custody. These papers note the seizure diagnosis that Dr. Di Rocco had written in the medical records, as described above, but do not specify the cause of the seizure or attribute it to epilepsy.

The discharge papers also contain stock descriptions and treatment recommendations for O'Doan's various diagnoses. For example, an abrasion is described as "a cut or scrape of the skin." For seizures (listed after abrasions and contusions), the stock description states that "[e]pilepsy is a brain disorder in which a patient has repeated seizures over time," but goes on to explain that "[t]here are many different problems that can cause seizures," including bodily disorders, "[i]mbalance of chemicals in the blood," and "[d]rug abuse." "In some cases," the stock language of the description goes on, "no cause is found." The general information about seizures in the discharge papers further includes the statement that "[a]fter a seizure, you may feel confused and sleepy."

Sanford and Leavitt agreed in the emergency room to arrest O'Doan for resisting a public officer, Nev. Rev. Stat. § 199.280.3, and indecent exposure, *id.* § 201.220.1.

O'Doan was released into police custody around 9:40 p.m., charged with both offenses, and booked into the county jail overnight, where he had his own cell. The next morning, O'Doan was released on bail. There is no mention in the arrest report, which Leavitt authored, or in the police report narratives that both officers prepared, of any alleged seizure. The declaration supplement to the arrest report does, however, note that O'Doan was brought to the hospital to be "evaluated for his injuries and other possible health issues." The district attorney brought charges against O'Doan, but nearly five months later dismissed the charges without prejudice.

O'Doan later filed this suit against Sanford, Leavitt, and the City of Reno. He alleged that both officers had wrongfully arrested him and violated due process in filing deliberately fabricated police reports, and further alleged that Sanford used excessive force when executing the reverse reap throw. O'Doan also brought related ADA claims against the City. The district court granted summary judgment to the defendants on all claims.

O'Doan timely appeals. We review the grant of summary judgment de novo. *Garcia*, 639 F.3d at 1208. Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In this posture, we view the facts and draw reasonable inferences in favor of the nonmoving party. *District of Columbia v. Wesby*, 138 S. Ct. 577, 584 n.1 (2018); *Scott v. Harris*, 550 U.S. 372, 378–379 (2007). "In the absence of material factual disputes, the objective reasonableness of a police officer's conduct is 'a pure question of law.'" *Lowry v. City of San Diego*, 858 F.3d

1248, 1254 (9th Cir. 2017) (en banc) (quoting *Scott*, 550 U.S. at 381 n.8).

## II

Officers sued under 42 U.S.C. § 1983 may be immune from civil liability under the doctrine of qualified immunity. Qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

To determine whether the officers are entitled to qualified immunity, "we consider (1) whether there has been a violation of a constitutional right; and (2) whether that right was clearly established at the time of the officer's alleged misconduct." *Jessop v. City of Fresno*, 936 F.3d 937, 940 (9th Cir. 2019) (quotations omitted). The Supreme Court has repeatedly emphasized the importance of faithfully applying these standards consistent with the purposes of qualified immunity.

"To be clearly established, a right must be sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right. In other words, existing precedent must have placed the statutory or constitutional question beyond debate." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (alteration in original; quotations omitted). "This demanding standard," the Supreme Court has instructed us, "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Wesby*, 138 S. Ct. at 589 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Although qualified immunity involves a two-step analysis, we may exercise our discretion to resolve a case only on the second ground when no clearly established law shows that the officers' conduct was unconstitutional. *Pearson*, 555 U.S. at 236–39, 242; *Orn v. City of Tacoma*, 949 F.3d 1167, 1174 (9th Cir. 2020); *see also Wesby*, 138 S. Ct. at 589 n.7 ("We continue to stress that lower courts 'should think hard, and then think hard again,' before addressing both qualified immunity and the merits of an underlying constitutional claim." (quoting *Camreta v. Greene*, 563 U.S. 692, 707 (2011))).

In the exercise of our discretion, and with the Supreme Court's admonitions in mind, we resolve this case only on the "clearly established law" prong of the qualified immunity framework. With the benefit of a 360-degree view of the facts and the luxury of reviewing the officers' actions from an armchair rather than a chaotic Reno street or an emergency room, there are some aspects of the officers' actions we can find commendable. In other instances, greater care may have been warranted. Our task, however, is not to serve as a police oversight board or to second-guess officers' real-time decisions from the standpoint of perfect hindsight, but to ask whether the officers violated clearly established law. Under the qualified immunity framework the Supreme Court has forcefully articulated and reaffirmed, the answer is clearly no.

## A

We begin with O'Doan's claim that Officer Sanford's use of a "reverse reap throw" amounted to excessive force, in violation of the Fourth Amendment's proscription against unreasonable seizures. *See Graham v. Connor*, 490 U.S. 386, 395–97 (1989). In evaluating qualified immunity in this context, the Supreme Court has reminded lower courts

that "[u]se of excessive force is an area of the law 'in which the result depends very much on the facts of each case,' and thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (per curiam) (quoting *Mullenix v. Luna*, 577 U.S. 7, 13 (2015) (per curiam)). The question, then, is whether "clearly established law prohibited" Sanford from using the degree of force that he did in the specific circumstances that the officers confronted. *See City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019) (per curiam); *see also White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam).

To evaluate the reasonableness of the force used, "we balance the 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against 'the countervailing government interests at stake.'" *Miller v. Clark County*, 340 F.3d 959, 964 (9th Cir. 2003) (quoting *Graham*, 490 U.S. at 396). We consider "the type and amount of force inflicted" as well as "(1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Id.* In the course of our review, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly resolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97.

Evaluating the facts of this case against the applicable body of Fourth Amendment law, we have little difficulty concluding that, at the very least, Officer Sanford did not violate clearly established law when he executed a reverse

reap throw on O'Doan.  Officers were called in to a "Code 3" situation, a request for immediate police assistance for a "violent" individual.  They arrived to find O'Doan naked and moving quickly on a busy street.  O'Doan repeatedly resisted officers' commands to stop and then turned to the officers in a threatening manner, with his fists clenched.

O'Doan's failure to follow "lawful commands, and [his] actions" in making threatening gestures "risked severe consequences."  *See Ames v. King County*, 846 F.3d 340, 349 (9th Cir. 2017).  The officers therefore acted reasonably in deciding to bring O'Doan under control.  Indeed, their efforts to do so may well have prevented O'Doan from harming himself or those around him.

The reverse reap throw maneuver that Officer Sanford used—a tripping technique that knocked O'Doan off balance and allowed Sanford to bring O'Doan to the ground—also involved a modest deployment of force.  It is not clear "less intrusive alternatives" would have sufficed to bring O'Doan under control, especially when O'Doan had refused to heed several warnings to stop.  *See Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 947 (9th Cir. 2017).  While O'Doan suffered some abrasions during this episode, his injuries were minor.  It is also not apparent these injuries resulted from the reverse reap throw *per se*, rather than O'Doan's combativeness once taken to the ground and the fact that O'Doan was naked.

O'Doan identifies no precedent that would suggest the force used here was excessive, much less that excessiveness was clearly established on these facts.  Indeed, we have held that officers were entitled to qualified immunity in cases involving much more significant uses of force in less challenging situations.  *See, e.g.*, *Shafer v. County of Santa Barbara*, 868 F.3d 1110, 1113, 1117–18 (9th Cir. 2017)

(officer did not violate clearly established law when college student "refuse[d] to comply with the officer's orders" to drop water balloons and the officer "progressively increase[d] his use of force from verbal commands, to an arm grab, and then a leg sweep maneuver," sending student "face first onto the pavement"); *Ames*, 846 F.3d at 344–45 (use of force not excessive when officer, responding to mother's call about her son's suicide attempt, "employed a hair hold to distract" the mother and then "slammed [her] head into the ground three times"); *see also, e.g.*, *Felarca v. Birgeneau*, 891 F.3d 809, 816 (9th Cir. 2018).

O'Doan claims the Supreme Court's decision in *Graham v. Connor*, 490 U.S. 386 (1989), clearly establishes that Officer Sanford's reverse reap throw was constitutionally excessive.  But *Graham* merely set forth the overarching standards that courts must apply in evaluating claims for excessive force.  *Id.* at 396.  Those standards are articulated at too high a level of generality to "squarely govern[]" this case.  *See Mullenix*, 577 U.S. at 15; *see also White*, 137 S. Ct. at 552 (explaining that "we have held that . . . *Graham*" does not by itself "create clearly established law outside 'an obvious case,'" and that "[t]his is not a case where it is obvious that there was a violation of clearly established law under . . . *Graham*" (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam)).  *Graham* also involved very different facts.  Among other things, *Graham* did not involve a person who acted in a threatening manner toward police or who presented a risk of harm to others.  The amount of force used in *Graham* was also much more significant than here.  *See* 490 U.S. at 389–90.

For all these reasons, the district court correctly concluded that Officer Sanford was entitled to qualified immunity on O'Doan's § 1983 excessive force claim.[1]

B

We turn next to O'Doan's claim that the officers lacked probable cause to arrest him. O'Doan does not dispute that he engaged in conduct that violated Nevada law. *See* Nev. Rev. Stat. §§ 199.280.3, 201.220.1. He instead contends that the officers lacked probable cause to arrest him because they should have known he lacked the mens rea to complete the offenses. In O'Doan's view, the officers knew or should have known that O'Doan was "innocent" of his facially unlawful conduct because O'Doan was in a post-ictal state when he committed the offenses.

In considering whether the officers are entitled to qualified immunity on this claim, we apply the same principles set forth above. But we do so with the benefit of additional guidance from the Supreme Court, both in terms of the standards that govern the probable cause inquiry and

---

[1] O'Doan also argues that the City violated the ADA because officers failed to make a reasonable accommodation when detaining him, *i.e.*, that they should have done so in a less forceful manner that was more appreciative of O'Doan's epilepsy. *See Sheehan v. City & County of San Francisco*, 743 F.3d 1211, 1232 (9th Cir. 2014), *rev'd in part on other grounds*, *City & County of San Francisco v. Sheehan*, 575 U.S. 600 (2015). The district court correctly granted summary judgment on this claim. Under the ADA, "the plaintiff bears the initial burden of producing evidence of the existence of a reasonable accommodation." *Id.* at 1233. O'Doan has not shown that a lesser amount of force would have been reasonable under the circumstances. For the same reasons, O'Doan's ADA failure to train claim likewise fails. O'Doan has not shown how personnel with different training would have acted differently given the exigencies of the situation.

how those standards should be applied in evaluating a related request for qualified immunity.

"To determine whether an officer had probable cause for an arrest, 'we examine the events leading up to the arrest, and then decide "whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to" probable cause.'" *Wesby*, 138 S. Ct. at 586 (quoting *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)). Probable cause is "a fluid concept" that "deals with probabilities and depends on the totality of the circumstances," which cannot "readily, or even usefully, [be] reduced to a neat set of legal rules." *Id.* (quotations omitted). It "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 243–44 n.13 (1983)). This "is not a high bar." *Id.* (quoting *Kaley v. United States*, 571 U.S. 320, 338 (2014)).

The Supreme Court's decision in *Wesby* instructs at length and with notable emphasis how courts should evaluate claims for wrongful arrest under qualified immunity's "clearly established law" requirement. In this context, "[t]he clearly established' standard . . . requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him." *Id.* at 590. The "rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted," which "requires a high degree of specificity." *Id.* (quotations omitted).

*Wesby* "stressed that the 'specificity' of the rule is especially important in the Fourth Amendment context." *Id.* (quotations omitted). Because of the "imprecise nature" of the probable cause standard, "officers will often find it difficult to know how the general standard of probable cause

applies in the precise situation encountered." *Id.* (quotations omitted). Thus, "[w]hile there does not have to be a case directly on point" to deny qualified immunity, "existing precedent must place the lawfulness of the particular arrest beyond debate." *Id.* (quotations omitted). "[A] body of relevant case law is usually necessary to clearly establish the answer with respect to probable cause." *Id.* (quotations omitted).

1

Evaluated under these stringent standards, Sanford and Leavitt are clearly entitled to qualified immunity. While we are sympathetic to O'Doan and acknowledge his disability, we cannot say that the officers here violated clearly established law in determining they had probable cause to arrest O'Doan after witnessing him engage in conduct that indisputably violated Nevada law. Simply stated, and as in *Wesby*, O'Doan has not "identified a single precedent— much less a controlling case or robust consensus of cases— finding a Fourth Amendment violation 'under similar circumstances.'" 138 S. Ct. at 591 (quoting *White*, 137 S. Ct. at 552). In fact, the only analogous case of which we are aware *granted* qualified immunity to the arresting officer.

In *Everson v. Leis*, 556 F.3d 484 (6th Cir. 2009), Everson, an epileptic, had a seizure at a mall. *Id.* at 489. When police and emergency personnel arrived on the scene, Everson was violent and combative. *Id.* at 489–90. The police then "hogtied" Everson and arrested him. *Id.* at 489. Everson told officers "that he was an epileptic and that their conduct was likely to cause him to suffer another seizure." *Id.* Nevertheless, Everson was taken to a detention center, where he again informed officials that he had epilepsy. *Id.* Everson was charged with assault and disorderly conduct

and spent two days in jail. *Id.* The charges were later dropped. *Id.*

Like O'Doan, Everson alleged that police did not have probable cause to arrest him because the officer ignored "exculpatory evidence of lack of mens rea." *Id.* at 500. The Sixth Circuit disagreed, holding that the arresting officer was entitled to qualified immunity on Everson's § 1983 wrongful arrest claim. *Id.* at 498–500. The Sixth Circuit acknowledged that "[v]iewed in the light best to Everson, he had recovered from his seizure when he arrived at the squad car." *Id.* at 499. In addition, the arresting officer "knew that Everson had suffered an epileptic seizure," and "[i]t is a fair inference" that "the deputy should have known that Everson's actions were made with, at best, a semi-conscious frame of mind." *Id.* Still, the Sixth Circuit held, any right to be free of arrest in these circumstances was not clearly established. *Id.* at 500.

The Sixth Circuit explained that "law enforcement officials are not necessarily precluded under federal law from arresting someone who displays symptoms of a known medical condition." *Id.* at 499. Everson "ha[d] committed an act that would clearly be a criminal act if committed by a non-disabled person." *Id.* at 500. While his alleged lack of mens rea by reason of his seizure could be a defense to criminal liability, "[i]t is not the rule that police must investigate a defendant's legal defenses prior to making an arrest." *Id.* (quotations and alterations omitted). Indeed, the officer had not violated clearly established law even though, unlike here, an Ohio statute required officers to "make a diligent effort to determine whether any disabled person he finds is an epileptic," and, "[w]henever feasible," to make this determination "before the person is charged with a crime

or taken to a place of detention." *Id.* at 499–500 (quoting Ohio Rev. Code § 2305.43(A)).**[2]**

Particularly given *Everson*, it cannot be said that Sanford and Leavitt violated clearly established law in concluding they had probable cause to arrest O'Doan. Law enforcement officers every day confront persons engaged in illegal conduct who may appear to lack some degree of control over their own actions. These situations can present difficult judgment calls for police officers, who face competing duties to ensure public safety and compliance with the law, while acting compassionately toward persons in need of help.

We are unaware of any case law—and neither O'Doan nor the dissent cite any—that should have made clear to Sanford and Leavitt that they lacked probable cause to make an arrest. *See Wesby*, 138 S. Ct. at 586. Whether a defendant had the mens rea to commit an offense can sometimes be the focus of substantial investigation, if not an entire criminal trial. O'Doan identifies no precedent that required the officers in the specific circumstances they encountered to

---

**[2]** In a subsequent decision, the Sixth Circuit affirmed the grant of summary judgment for the defendants on Everson's related ADA claims. *Everson v. Leis*, 412 F. App'x 771 (6th Cir. 2011). The court held that there was no intentional discrimination under the ADA because while the officer knew Everson recently had a seizure, Everson "allege[d] no facts that could support his bare conclusion that [the officer] *knew* that Everson's seizure was ongoing during the relevant time period." *Id.* at 778. The dissent speculates that "the result in *Everson* was materially affected by the failures of Everson's counsel." But the Sixth Circuit issued two substantial decisions in *Everson* that focused intently on the principles that must be applied to a case involving similar facts as this one. It is the Sixth Circuit's analysis that is relevant here, which at the very least confirms the absence of clearly established law establishing that the officers' actions here were unconstitutional.

pretermit those processes entirely and decide on their own—on a busy street or in an emergency room—that O'Doan's facially unlawful conduct should be excused. If arresting officers had to accept at face value claims of potential lack of mens rea, as here, many arrests for unlawful conduct would likely be called into question, with significant public safety consequences. The most relevant decision (*Everson*) affirmatively supported the officers' arrest of O'Doan. But at the very least, there was no decision—or indeed, any relevant body of law or precedent—that "clearly prohibit[ed]" O'Doan's arrest in the "particular circumstances" that the officers confronted. *Wesby*, 138 S. Ct. at 590.

The specific facts of this case underscore this. Once on the scene of a "Code 3" emergency, the officers encountered a mobile individual who appeared to recognize verbal commands and turned to flee at a quicker pace. Officers could conclude that O'Doan was not in the midst of a seizure at this time (and there is no suggestion he was). Instead, officers witnessed O'Doan engage in unlawful conduct that included O'Doan refusing to comply with officers' orders, raising his fists toward them in a threatening manner, and combatively engaging them in a "major struggle."

The officers could reasonably infer they had probable cause to arrest O'Doan based on their observations of his conduct. *Wesby*, 138 S. Ct. at 592 (referencing case law "emphasiz[ing] that officers can rely on the ordinary and reasonable inference that people know what they are doing when they act" (quotations omitted)); *id.* at 593 (explaining that "[t]here was no controlling case holding . . . that officers cannot infer a suspect's guilty state of mind based on his conduct alone").

## 2

Nor did any "clearly established law" require the officers to conclude that probable cause had dissipated once O'Doan was discharged from the hospital. Our fine colleague in dissent concludes otherwise by relying on the general principle that a "person may not be arrested, or must be released from arrest, if previously established probable cause has dissipated." *United States v. Ortiz-Hernandez*, 427 F.3d 567, 574 (9th Cir. 2005) (per curiam). While we have no quarrel with that high-level principle, the dissent's reliance on it in this context is improper.

The Supreme Court "ha[s] repeatedly stressed that courts must not define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Wesby*, 138 S. Ct. at 590 (quotations omitted). In the qualified immunity context, "[a] rule is too general if the unlawfulness of the officer's conduct does not follow immediately from the conclusion that the rule was firmly established." *Id.* (quotations and alterations omitted). That is the case here.

The authorities the dissent cites applying the "dissipation" principle involved vastly different circumstances. In those cases, officers had arrested a person and then became aware that there was no basis to conclude the person had engaged in *any* criminal conduct *at all*. *See, e.g.*, *Nicholson v. City of Los Angeles*, 935 F.3d 685, 691 (9th Cir. 2019) (no probable cause because "it was soon apparent to the officers that the teenagers were unarmed, posed no threat to anyone, and were not engaged in any criminal activity"); *Ortiz-Hernandez*, 427 F.3d at 574–75 (probable cause dissipated after strip search of suspected drug dealer revealed "no drugs, no drug paraphernalia, . . .

no other evidence of drug sales," and no other incriminating evidence).

In this case, in sharp contrast, nothing that happened in the emergency room could or did change the fact that O'Doan *had*, without doubt, engaged in illegal conduct‒which the officers had personally observed and experienced firsthand.  The authorities the dissent cites could have provided no guidance to the officers on the relevant question here, which is whether law enforcement was compelled to conclude that a hospital report was dispositive of probable cause, even though the arrestee had engaged in illegal conduct.

The nuanced situation in the emergency room only further bears out our conclusion that officers were entitled to qualified immunity.  O'Doan did tell Leavitt he believed he had a seizure.  But in light of Leavitt's observations of O'Doan earlier, Leavitt was not required to credit O'Doan's explanation.  *Wesby*, 138 S. Ct. at 588.  Leavitt also gave uncontradicted testimony that, after speaking with a doctor at the hospital, "it was no, like this does not match up to what Mr. O'Doan is saying," and Leavitt found O'Doan's behavior "unusual for me, from what I understand a seizure to be."  Leavitt's assessment may have been incorrect, but O'Doan cannot show it was objectively unreasonable.  *See, e.g.*, *Wesby*, 138 S. Ct. at 591 ("Even assuming the officers lacked probable cause to arrest the [plaintiffs], the officers are entitled to qualified immunity because they reasonably but mistakenly concluded that probable cause was present." (quotations and alterations omitted)).

The medical discharge papers that Sanford signed at the hospital confirm that qualified immunity is warranted. There is no indication that the discharge papers Sanford

signed diagnosed O'Doan with epilepsy. And while they did list O'Doan's diagnosis as "seizure," Dr. Di Rocco explained that this diagnosis was based on O'Doan's self-reporting. Nothing in the discharge papers confirmed that O'Doan had, in fact, suffered a seizure (which not even Dr. Di Ricco could conclude), much less that O'Doan's wrongful conduct at the time of the offenses was the product of a post-ictal state. Nor did the discharge papers confirm the cause of any seizure.

Instead, the discharge papers contained stock language about seizures, including that "[t]here are many different problems that can cause seizures," and that sometimes what prompts a seizure cannot be determined. Police officers are not medical doctors. And the Constitution does not require that officers consult with expert witnesses before making an arrest. No clearly established law required the officers here to treat an emergency room diagnosis as conclusive of a lack of criminality, especially when the suspect had engaged in facially unlawful conduct. *See Wesby*, 138 S. Ct. at 588 (in probable cause analysis, facts cannot be viewed "in isolation" (quotations omitted)); *Kaley*, 571 U.S. at 338 (probable cause "is not a high bar"). Certainly, no clearly established law required that conclusion in the face of the limited and largely boilerplate information in the medical discharge papers here.

The dissent is thus incorrect that the officers are unentitled to qualified immunity because there is a supposed factual dispute whether they learned that O'Doan had a seizure or had epilepsy. There is evidence, as we have discussed, that Sanford and Leavitt were aware of reports, ultimately sourced to O'Fria and later O'Doan, that O'Doan had had a seizure at some point prior. We have more difficulty with the suggestion that the officers knew that O'Doan was reported to have epilepsy, as the sources for that

suggestion are 911 calls the officers did not hear and medical files they did not receive. But we will assume for purposes of this appeal that the officers did receive reports, attributable either to O'Fria or O'Doan, that O'Doan was epileptic. The dissent is thus incorrect in claiming that we are "crediting" the officers' testimony. We are instead construing disputed facts in favor of O'Doan and explaining why qualified immunity is nonetheless required.

The officers' awareness that O'Fria or O'Doan had reported O'Doan having a seizure or epilepsy do not change the equation. Supreme Court precedent is clear that "probable cause does not require officers to rule out a suspect's innocent explanation for suspicious facts." *Wesby*, 138 S. Ct. at 588. Here, the facts were not merely suspicious of potential criminal wrongdoing but reflected conduct that on its face violated Nevada law. The Supreme Court has acknowledged case law recognizing that "it would be an unusual case where the circumstances, while undoubtedly proving an unlawful act, nonetheless demonstrated so clearly that the suspect lacked the required intent that the police would not even have probable cause for an arrest." *Id.* at 592 (quotations omitted). Nothing in clearly established law would have indicated to Sanford and Leavitt that this was such an "unusual" case.

What this means is that no clearly established law required the officers to credit O'Fria and O'Doan's explanation and deem true a possible defense, namely, that O'Doan lacked the wherewithal to be responsible for unlawful conduct. *See Everson*, 556 F.3d at 500. "[I]nnocent explanations—even uncontradicted ones—do not have any automatic, probable-cause-vitiating effect." *Wesby*, 138 S. Ct. at 592. And even if Sanford and Leavitt had credited O'Fria and O'Doan's explanations as a general

matter, nothing required the officers to reach the further conclusion that O'Doan was in a post-ictal state when he engaged in the wrongful acts. Dr. Di Rocco himself could not make that assessment. If qualified immunity means anything, it is that clearly established law did not require officers to make a medical judgment that not even O'Doan's treating physician was willing to hazard.

The dissent thus errs in concluding that a report from O'Doan's expert, Dr. Gary Greenberg, creates a dispute of material fact. Dr. Greenberg opined that O'Doan had an epileptic seizure before the officers arrived on the scene and "was in a post-ictal state when [EMS] and Reno police arrived." But Dr. Greenberg does not claim the officers diagnosed, or should have been able to diagnose, O'Doan's post-ictal state. Nor could he offer such an opinion. Dr. Greenberg's report in fact states that "[c]ertainly, I am not knowledgeable about proper police procedure in the apprehension" of persons like O'Doan. Moreover, Dr. Greenberg described how "in a post-ictal phase a patient may appear outwardly appropriate but still [be] undergoing seizure activity," which makes the officers' decisions here that much more understandable.

In all events, the dissent's focus on Dr. Greenberg incorrectly frames the inquiry. Probable cause and qualified immunity are assessed from "the standpoint of an objectively reasonable police officer," *Wesby*, 138 S. Ct. at 586 (quotations omitted), not the after-the-fact perspective of a medical expert. We can assume the truth of Dr. Greenberg's expert report and still conclude that, under the legal standards that govern, the officers did not violate clearly established law in arresting O'Doan.

The dissent's repeated contention that we have not abided by the summary judgment standards is therefore

simply wrong.  We have faithfully applied those standards and have not "ignore[d]" O'Doan's evidence, as the dissent mistakenly claims.  It is the dissent that reflects an unwillingness to apply the standards that govern the qualified immunity analysis—standards the Supreme Court has repeatedly emphasized in reversing lower courts for failing to follow them.

3

Finally, we must reject O'Doan's (and the dissent's) contention that O'Doan's arrest was unconstitutional because this is "an 'obvious case' where 'a body of relevant case law is not needed." *Wesby*, 138 S. Ct. at 591 (quoting *Brosseau*, 543 U.S. at 199).  The situations where a constitutional violation is "obvious," in the absence of any relevant case law, are "rare." *Id.* at 590.  That teaching resonates even more powerfully in the Fourth Amendment context.  As we have explained, the "obviousness principle, an exception to the specific-case requirement, is especially problematic in the Fourth-Amendment context." *Sharp v. City of Orange*, 871 F.3d 901, 912 (9th Cir. 2017).  "[T]o say that it is almost *always* wrong for an officer in those circumstances to act as he did" is a "categorical statement" that is "particularly hard to make when officers encounter suspects every day in never-before-seen ways." *Id.*; *see also West v. City of Caldwell*, 931 F.3d 978, 987 (9th Cir. 2019).

The obviousness principle thus has "real limits when it comes to the Fourth Amendment," *Sharp*, 871 F.3d at 912, and we decline to transgress those limits here.  Construing the facts in the light most favorable to O'Doan, officers were placed in an emergency situation involving a person acting dangerously and unlawfully.  While it was unclear what prompted O'Doan's wrongful behavior, nothing made it obvious that officers had to accept O'Fria and O'Doan's

explanations and conclude on the spot that O'Doan was not responsible for his actions.

Other aspects of the record only confirm that the situation here was not "obvious," but at best ambiguous. Emergency personnel at the scene, who had nearly fifty years of EMT experience combined, were emphatic that O'Doan's conduct was inconsistent with a post-ictal state and more consistent with drug usage. Leavitt had the same concern. We assume that they were mistaken, as we must on summary judgment. We simply note their testimony to show that the situation was not an "obvious" one—even to those with medical training who observed it.

Materials from the Epilepsy Foundation on which O'Doan relies only reaffirm that the obviousness principle is inapplicable here. Those materials make clear that "not every episode of confusion or illegal activity is seizure-related," that seizures have many causes, and that "[d]istinguishing epileptic seizures from episodes resulting in seizures is beyond reasonable expectations of law enforcement." These materials bely any suggestion that the questions confronting the officers here had any obvious answer.

O'Doan's reliance on the Supreme Court's recent decision in *Taylor v. Riojas*, 141 S. Ct. 52 (2020), is unavailing. There, the Supreme Court held it was obvious that keeping an inmate in a cell "teeming with human waste" for six days, and forcing him to sleep naked in raw sewage, violated the Eighth Amendment. *Id.* at 53 (quotations omitted). *Taylor* only highlights the level of blatantly unconstitutional conduct necessary to satisfy the obviousness principle. Suffice to say, this case bears no reasonable comparison to *Taylor*.

We therefore hold that the district court properly granted qualified immunity to Sanford and Leavitt on O'Doan's § 1983 wrongful arrest claim.[3]

C

We lastly consider O'Doan's § 1983 claim that the officers violated due process because they did not discuss O'Doan's reported seizure in their police report and affidavit supporting probable cause. O'Doan relies mainly on *Devereaux v. Abbey*, 263 F.3d 1070 (9th Cir. 2001) (en banc), which states that "there is a clearly established constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government." *Id.* at 1074–75.

*Devereaux* does not govern here because O'Doan has not shown how any clearly established law rendered unconstitutional the omission of his claimed seizure in the officers' reports and affidavit. In *Devereaux*, we were clear that to support a deliberate fabrication of evidence claim, the plaintiff "must, *at a minimum*, point to evidence that supports at least one of the following two propositions:

---

[3] Assuming O'Doan can assert a parallel ADA wrongful arrest claim against the City, *see Sheehan*, 743 F.3d at 1232, that claim likewise fails. To make out such a claim and recover money damages (which O'Doan seeks), O'Doan would need to "prove intentional discrimination on the part of the defendant." *Duvall v. County of Kitsap*, 260 F.3d 1124, 1138 (9th Cir. 2001) (as amended). This standard is met through a showing of "deliberate indifference," which "requires both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that . . . likelihood." *Id.* at 1138–39. Based on the record evidence we have recited above, O'Doan cannot show that the officers acted with deliberate indifference. *See also Updike v. Multnomah County*, 870 F.3d 939, 951–52 (9th Cir. 2017) (deliberate indifference "must be a result of conduct that is more than negligent" (quotations omitted)).

(1) Defendants continued their investigation of [the plaintiff] despite the fact that they knew or should have known that he was innocent; or (2) Defendants used investigative techniques that were so coercive and abusive that they knew or should have known that those techniques would yield false information." *Id.* at 1076. Construing the facts in the light most favorable to O'Doan, neither of those circumstances is present here. Nor has O'Doan come forward with "direct evidence of deliberate fabrication." *Spencer v. Peters*, 857 F.3d 789, 799 (9th Cir. 2017) (emphasis omitted).

In fact, if anything, *Devereaux* made clear that allegations analogous to the ones O'Doan raises here would be insufficient to show deliberate fabrication. That is because *Devereaux* held that "withholding exculpatory evidence . . . cannot in itself support a deliberate-fabrication-of-evidence claim." *Id.* at 1079. Deliberate fabrication, in other words, must mean something more than a mere omission. Regardless, we have located no clearly established law, and O'Doan and the dissent cite none, that would suggest police officers commit a due process violation when they omit from their write-ups initial accounts from an arrestee or others that the arrestee had undergone a seizure at some point before the unlawful conduct.

In this case, moreover, Leavitt's report did state that O'Doan was transported to a hospital to be "evaluated for his injuries *and other possible health issues*." Nothing in clearly established law suggests that the officers were required to provide more detail to avoid violating the Constitution (the police reports likewise did not mention Leavitt's skepticism as to whether O'Doan's claimed seizure had caused his conduct). While we can agree that more information is usually better than less and that including more specific

information about reports of O'Doan's possible seizure would have been preferable, the question here is whether officers violated clearly established law. It is plain they did not.

The dissent claims that "an even clearer sign of intentional fabrication" is that Officer Leavitt in a handwritten portion of his affidavit listed O'Doan's offense time at 6:50 pm and his arrest time at 7:02 pm, when in fact O'Doan was not formally arrested until he was discharged from the hospital. The dissent is incorrect. If such a minor discrepancy qualified as a "clear sign" of "intentional fabrication" sufficient to defeat qualified immunity, law enforcement officers would find themselves on trial for nearly every police report they draft. Here, it was certainly understandable for Leavitt to note O'Doan's arrest time as 7:02 pm when officers had at that point placed him in handcuffs and leg restraints. Leavitt's same affidavit also specifically (and accurately) notes that O'Doan was later taken to the hospital for evaluation and released into officers' custody.

Police reports can be written quickly, at odd hours, and with other law enforcement matters pressing. It is unreasonable to presume, as the dissent does, that Leavitt's recordation of the arrest time was part of some elaborate scheme to fabricate facts. If there was an inaccuracy in Leavitt's affidavit, it was a technical one at best. There is no basis to treat this as a deliberate fabrication of evidence.

\* \* \*

We affirm the district court's grant of summary judgment on O'Doan's federal claims. For the same reasons,

we affirm the district court's grant of summary judgment on O'Doan's parallel state law claims.

**AFFIRMED.**

---

BLOCK, Senior District Judge, dissenting in part:

The majority's opinion is a textbook example of highly skilled craftsmanship and spot-on articulation by my talented colleagues of the legal principles governing qualified immunity for police officers in the performance of their duties. If not for one principal flaw in the application of these principles, I would wholeheartedly cast the third vote for affirmance. Surely, based upon the majority's recitation of the facts, summary judgment would be warranted.

But the problem with the majority's opinion is that there are clearly material factual disputes and credibility determinations that are for a jury – not judges – to resolve. Accordingly, I dissent from those parts of the opinion granting summary judgment for the police officers on O'Doan's § 1983 false arrest and due process claims, as well as on his ADA claim.[1]

## I.

I disagree that reviewing the facts "in the light most favorable to O'Doan," as the majority professes to do, warrants granting summary judgment. The majority has selectively chosen to overlook other relevant facts that a jury

---

[1] I concur in those parts of the majority's opinion upholding the district court's grant of summary judgment on the excessive force and failure to train claims.

should be permitted to consider. The majority's basic mistake is its failure to recognize and apply the legal principles governing summary judgment. Indeed, it makes no mention of these principles, which are designed to prevent judges from usurping the province of the jury.

We best articulated the summary judgment test years ago in *T.W. Elec. Serv. Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626 (9th Cir. 1987). Drawing on Supreme Court precedent and the language of Federal Rule of Civil Procedure 56, we laid down the following principles:

(1) "Rule 56 provides that summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *T.W. Elec.*, 809 F.2d at 630 (internal quotations omitted).

(2) "Whether a 'genuine' issue can be said to exist with respect to a material fact is often a close question. Clearly, the nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id*. (internal quotations omitted).

(3) "Instead, the nonmoving party must set forth, by affidavit or as otherwise provided in Rule 56, *specific facts* showing that there is a genuine issue for trial. Hence the nonmoving party may not merely state that it will discredit the moving party's evidence at trial and proceed in the hope that something can be developed at trial in the way of evidence to support its claim. Instead, it must produce at least some significant probative evidence tending to support the complaint." *Id.* (internal quotations and citations omitted).

(4) "[T]he issue of material fact required by Rule 56(c) to be present to entitle party asserting its existence; rather, all that is required is that sufficient evidence sup porting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial. Thus, at this stage of the litigation, the judge does not weigh conflicting evidence with respect to a disputed material fact." *Id.* (internal quotations and citations omitted).

(5) "Nor does the judge make credibility determinations with respect to statements made in affidavits, answers to interrogatories, admissions, or depositions. These determinations are within the province of the factfinder at trial." *Id.*

(6) "[A]t summary judgment, the judge must view the evidence in the light most favorable to the nonmoving party: if direct evidence produced by the moving party conflicts with direct evidence produced by the nonmoving party, the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact. Put another way, if a rational trier of fact might resolve the issue in favor of the nonmoving party, summary judgment must be denied." *Id.* at 630–31.

(7) "Inferences must also be drawn in the light most favorable to the nonmoving party. Inferences may be drawn from underlying facts that are not in dispute, such as background or contextual facts and from underlying facts on which there is conflicting direct evidence but which the judge must assume may be resolved at trial in favor of the nonmoving party." *Id.* at 631 (internal citations omitted).

(8) "Thus, the court's ultimate inquiry is to determine whether the specific facts set forth by the nonmoving party, coupled with undisputed background or contextual facts, are

such that a rational or reasonable jury might return a verdict in its favor based on that evidence." *Id.* (internal quotations omitted).

(9) "If the nonmoving party produces direct evidence of a material fact, the court may not assess the credibility of this evidence nor weigh against it any conflicting evidence presented by the moving party. The nonmoving party's evidence must be taken as true." *Id.*

The same principles apply in assessing whether to grant summary judgment for a defendant on the grounds of qualified immunity. *See Newmaker v. City of Fortuna*, 842 F.3d 1108, 1111, 1116 (9th Cir. 2016).

As a trial judge for the last twenty-six years, I have granted summary judgment on qualified immunity grounds to many police officers in recognition of the uncertainties and life-threatening risks they daily face to protect us. But I have also been obliged to let a jury make that decision whenever there are not clearly undisputed, dispositive facts, and especially when factual resolutions depend on credibility determinations. Such is this case.

## II.

The core issue here is whether the police knew or should have known they were arresting a criminal or an epileptic. On this record, this is a quintessential question for a factfinder, not a judge. No one disputes, nor rationally can, the obvious: you do not put an epileptic in jail. *See Bryan v. MacPherson*, 630 F.3d 805, 829 (9th Cir. 2010) ("A mentally ill individual is in need of a doctor, not a jail cell"); *see also District of Columbia v. Wesby*, 138 S. Ct. 577, 590

(2018) (defining "clearly established" law).[2] It is "beyond debate" that you take seizure patients to the hospital, not to jail. *MacPherson*, 630 F.3d at 829.

The majority's palpable failing is that it credits all the testimony of the police and the emergency personnel and ignores all the contrary documentary and testimonial evidence that places their credibility in serious doubt. By doing so, the majority's opinion disregards at least three of the basic summary judgment principles:

(1) The judge does not "make credibility determinations with respect to statements made in affidavits, answers to interrogatories, admissions, or depositions. These

---

[2] Justice Gorsuch cogently articulated this "obviousness" principle as a circuit judge:

> In deciding the clearly established law question this court employs a sliding scale under which the more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation. After all, some things are so obviously unlawful that they don't require detailed explanation and sometimes the most obviously unlawful things happen so rarely that a case on point is itself an unusual thing. Indeed, it would be remarkable if the most obviously unconstitutional conduct should be the most immune from liability only because it is so flagrantly unlawful that few dare its attempt.

*Browder v. City of Albuquerque*, 787 F.3d 1076, 1082–83 (10th Cir. 2015) (internal quotations and citations omitted); *see also Northern v. City of Chicago*, 126 F.3d 1024, 1028 (7th Cir. 1997) ("[T]he police cannot obtain immunity for liability for false arrest by arresting people on preposterous charges and then pointing to the absence of any judicial decision that declares the statutory interpretation underlying the charges to be preposterous.").

determinations are within the province of the factfinder at trial." *T.W. Elec.*, 809 F.2d at 630.

(2) "If the nonmoving party produces direct evidence of a material fact, the court may not assess the credibility of this evidence nor weigh against it any conflicting evidence presented by the moving party. The nonmoving party's evidence must be taken as true." *Id.* at 631

(3) "Inferences must also be drawn in the light most favorable to the nonmoving party. Inferences may be drawn from underlying facts that are not in dispute, such as background or contextual facts and from underlying facts on which there is conflicting direct evidence but which the judge must assume may be resolved at trial in favor of the nonmoving party." *Id.* (internal citations omitted).

Just a few examples will suffice to explain how the majority ignores these principles.

### A. At the Scene

### 1. The Facts

It all began with the 911 call by O'Fria. The detail is important. At about 6:45 on the evening of July 15, 2016, O'Fria made a 911 call from her home in the Shade Tree Trailer Park in Reno, Nevada, to report that she needed an ambulance because her "boyfriend had an epileptic seizure." She thought it was "very, very bad" and said that "[h]e is nude and he tends to wander the neighborhood."

The 911 operator immediately called "paramedics" who asked for the "address of the emergency." Subsequently, someone named Piper (presumably the 911 operator) called "Dispatch." Piper gave dispatch O'Doan's address and said

that the "[p]atient is postictal and violent at this time." Dispatch then said, "[a]ll right. I'll let them know."

Moments later, someone named Emily called 911 from dispatch and had O'Fria patched in. Before O'Fria spoke, Emily commented that O'Doan "is postictal and very uncooperative and violent." O'Fria told dispatch and 911 that O'Doan "has epilepsy" and twice told them that he is "having a very bad epileptic seizure." O'Fria then said that O'Doan is "trying to leave," "he's naked," "[h]e's trying to break out of the window, and "[h]e's hurting himself very, very bad." Someone on this three-way call told O'Fria: "I will let [emergency personnel] know" about O'Doan's seizure. The transcribed record then reports that there may have been a disconnect.

O'Fria then called 911 again and stated that O'Doan "is in a fugue state right now," "last time the cops attacked him for not listening," and "please make sure they know he's epileptic." The operator responded that "the officers have to do whatever they have to do to keep themselves and everybody else safe," and "I did let them know that . . . he's having a grand mal seizure."

Although the transcript is not a paradigm of clarity, it is apparent O'Fria then repeated that "[h]e is epileptic," explaining that "he is having a grand mal seizure," and begged the operator to "make sure that [the cops] know he's epileptic." The call ended with the operator saying, "I am going to let the officers know everything."

I have listened to the audio, which is an exhibit, and believe that what is translated on the written transcript, although commingled and somewhat disjointed, is substantively correct. I have labored to report it fully and

accurately because it bears directly on the critical issue of the officers' knowledge.

Officer Sanford claims that although he had all the dispatch information in his police car, he never listened to all the 911 calls and had only a limited recollection of what was communicated to him. Here is his testimony about his abject ignorance:

First, he said "I didn't hear the 911 call before I arrived on the scene." Under continued questioning, Officer Sanford initially persisted in his lack of knowledge about the 911 calls. But, finally, he acknowledged being advised before he got to the scene that "the subject is in a grand mal seizure" and that the "last time officers attacked him [was] due to him being in a seizure."

Officer Leavitt testified similarly. Like Officer Sanford, he professed to have limited knowledge of the 911 calls. And the majority credits his testimony that "he did not remember reading the EMS advisory on the car computer and was not aware, upon arriving at the scene, that O'Doan had allegedly suffered a seizure." The majority goes further. While acknowledging that although "[t]here is evidence . . . that Sandford and Leavitt were aware of reports, ultimately sourced to O'Fria and later O'Doan, that O'Doan had had a seizure," it discounts this evidence because it credits the officers' testimony that they "did not hear" the 911 calls.

But the record reflects that the officers acknowledged having some knowledge – albeit limited – of what was communicated to them before they arrived at the scene. A jury should assess their credibility and determine what they knew or should have known about O'Doan's condition. It may not agree with the majority's factual finding that the officers "did not hear the 911 calls."

The majority also supports its decision by crediting the testimony of the "emergency personnel at the scene" who "did not believe O'Doan had suffered a seizure or that he was in a 'post-ictal' (post seizure) state." In particular, the majority relies on the testimony of two firefighters who "believed [O'Doan] was on drugs." One of them, Trevor Alt, boasted that "he would disagree with [any] doctor" who determined that O'Doan was in a post-ictal state.

In fact, plaintiff's expert, Dr. Greenberg – a specialist in emergency medicine who never had the opportunity to testify – had opined in his expert report that "Mr. O'Doan had experienced a grand mal seizure and was in a post-ictal state when REMSA and Reno police arrived," and that O'Doan "was substantively not in a rational mental state . . . [nor could he] understand the nature and quality of his action."

The majority also references firefighter Blondfield's testimony that although he "informed EMS that O'Fria had told him on the scene that O'Doan had a history of seizures," he "did not recall EMS's response," nor did he "recall passing on this information to the police officers."

The majority makes the further finding that even if the officers knew that O'Doan was "having a seizure or epilepsy," the facts reflected "potential criminal wrongdoing" and "conduct that on its face violated Nevada law." Presumably, the law the majority has in mind is that it would be indecent exposure to run around naked in public. There is, however, another Nevada law, which a jury could assess if it were given the opportunity to pass upon the facts that are truly at the heart of this case. Nev. Rev. Stat. § 433A.160 (2015) authorizes the police to "[t]ake a person alleged to be a person with mental illness into custody to apply for emergency admission of the person for evaluation,

observation and treatment" and to "[t]ransport the person . . . to a public or private . . . hospital."

Officer Leavitt testified that at the scene O'Doan was looking at him with "an upset face, angry that I'm there." But although O'Doan "presented towards [Leavitt] like he would have come towards [Leavitt] right there," O'Doan never "actually attack[ed him.]" The officers restrained O'Doan, who was 5'3" and weighed 160 pounds, with a "reverse reap throw" to prevent him from hurting himself. As the majority opinion recounts, "[w]hile O'Doan suffered some abrasions during this episode, his injuries were minor."

Notably, O'Doan was not arrested at the scene. Rather, as the majority writes, "EMS administered a sedative," which began to relax him. O'Doan "was then loaded onto a gurney and into an ambulance," and transported to the hospital. The majority opinion then recounts Officer Leavitt's testimony "that because it was 'uncommon to have an individual naked running down the street,' officers in that type of situation want to ensure persons like O'Doan are 'not on any foreign substances to make them mentally not sound there, to make them act in this behavior that isn't common.'"

Based on this suspect record, if I were still a trial lawyer, I would have a field day cross-examining the police officers and firefighters whose testimony the majority fully credits. And I'm fairly confident that a jury might believe that Dr. Greenberg's knowledge of medicine is superior to that of firefighter Alt's. But, the most telling part of my cross-examination would focus on Officer Leavitt's testimony.

## 2. Cross-Examination

The following would be a snippet of the questions I would ask Officer Leavitt:

Q. The 911 Operator testified that she "let the officers know everything." How then can you claim that "you did not hear the calls" or know why the EMS was being dispatched to the scene?

Q. Did you have any reason to believe, therefore, that you were being dispatched to a crime scene?

Q. Isn't the reason why you had to administer a "reverse reap throw" was because you saw that O'Doan was thrashing around while running around naked and at risk of hurting himself?

Q. Isn't it true that O'Doan was not a threat to you and "he never actually attacked you?"

Q. Did you really believe that a person reportedly in the throes of an epileptic episode and running around naked was committing a crime?

Q. Are you aware that under Nevada's indecent exposure law the exposure must be intentional?

Q. Are you aware that under Nevada law the correct police response for someone in O'Doan's condition was to take him into custody to transport him to a hospital for "evaluation, observation and treatment?"

Q. O'Doan only sustained "minor injuries" from the "reverse reap throw" and you did not arrest him at the scene. You testified that it was "uncommon to have an individual naked running down the street and that you wanted to ensure that persons like O'Doan are "not on any foreign substances to make them mentally not sound there, to make them act in this behavior that isn't normal." Isn't the primary reason

O'Doan was placed in a gurney and taken to the hospital was because of his mental condition?

Q. O'Fria told the 911 Operator that O'Doan was "having an epileptic seizure," that "[h]e has epilepsy," and that "[h]e's having a very bad epileptic seizure." And, further, that "[h]e's trying to leave," "he's naked," "he's trying to break out of the window," and [h]e's hurting himself very, very, bad." How can it be that you only had limited knowledge of the 911 calls if you knew O'Doan had a seizure?

Q. Did you speak with O'Fria about this incident at the scene, and if not, why not?

Q. If O'Fria had called from an office in the United States Supreme Court and told you her boyfriend had just bolted out of the building, was having a seizure and was running down Pennsylvania Avenue naked, would you arrest him for indecent exposure?

Based upon Officer Leavitt's answers to these questions, the jury would be able to size up his credibility and determine whether the officers knew or should have known that O'Doan was an epileptic and had not committed a crime.

## B. At the Hospital

### I.   The Facts

If there was any doubt before O'Doan was sent to the hospital that he was not in his right mind when he was running around naked hours earlier, the events at the hospital confirmed that the officers knew or should have known that O'Doan did not have the requisite *mens rea* to warrant his arrest.

As succinctly stated in *U.S. v. Ortiz-Hernandez*:

> [a] person may not be arrested, or must be released from arrest, if previously established probable cause has dissipated. As a corollary. . . of the rule that the police may rely on the totality of facts available to them in establishing probable cause, they also may not disregard facts tending to dissipate probable cause.

427 F.3d 567, 574 (9th Cir. 2005) (internal quotations omitted); *see also Nicholson v. City. of L.A.*, 935 F.3d 685, 691 (9th Cir. 2019) ("A reasonable officer would know that participation in an ongoing seizure after any probable cause had dissipated violates the Fourth Amendment.").

Thus, qualified immunity does not attach if an arrest occurs after probable cause dissipates. *See Broam v. Bogan*, 320 F.3d 1023, 1032 (9th Cir. 2003) ("An officer is not entitled to [] qualified immunity . . . where exculpatory evidence is ignored that would negate a finding of probable cause."); *see also C.L. by and through Leibel v. Grossman*, 798 F.App'x 1015 (9th Cir. 2020) (no qualified immunity for officer whose probable cause dissipated upon learning suspect was autistic).[3]

---

[3] The district court and the majority relied heavily on *Everson v. Leis*, 556 F.3d 484 (6th Cir. 2009), noting that it involved an epileptic man who alleged police did not have probable cause to arrest him due to a lack of *mens rea*. The Sixth Circuit found the arresting officer was entitled to qualified immunity. The majority fails to note the result in *Everson* was materially affected by the failures of Everson's counsel, who did not respond to the defendant's summary judgment motion and was subsequently suspended from the practice of law. In the absence of

Officer Leavitt acknowledged that O'Doan was not arrested until he was released from the hospital, about two hours after he was admitted. He "made the decision at [the hospital]," and had told that to Sanford, who "did not object." At that time O'Doan was not in handcuffs, was in a hospital gown, had been treated for his epilepsy, and had been discharged. But instead of sending him home to be cared for by his girlfriend, Officer Leavitt cuffed him, told him he was under arrest, put him in a paddy wagon, and placed him in jail. O'Doan remained there until his mother bailed him out in the morning.

Officer Sanford did this even though he acknowledged receiving and signing a seven-page hospital discharge report that diagnosed O'Doan as having had a seizure. The very first page of the document expresses clearly, "**Your Diagnosis Was Seizure**." (emphasis in original). In addition, just three pages before Officer Sanford's signature, the document connects O'Doan's seizure activity to his broader medical condition of epilepsy:

> **A seizure is abnormal electrical activity in the brain**. Seizures can cause a change in attention or behavior *(altered mental status)*. Seizures often involve uncontrollable shaking *(convulsions)*. Seizures usually last from 30 seconds to 2 minutes. **Epilepsy is a brain disorder in which a patient has repeated seizures over time.**

---

"affidavits or other forms of evidence from Everson's side," it is hardly surprising the Sixth Circuit granted the summary judgment motion. *Everson*, 556 F.3d at 496.

(emphasis added). Whether Officer Sanford knew of the contents and significance of the document he signed is a critical question that must be resolved by a jury and not by judges.

The majority also states that Officer Leavitt "gave uncontradicted testimony that, after speaking with a doctor at the hospital . . . [the facts did] not match up to what Mr. O'Doan is saying." However, I invite my colleagues to search the record to locate any support for Officer Leavitt's "testimony." They won't find it.

The doctor in question was Dr. DiRocco. He unequivocally testified that he could not recall ever "discuss[ing] Mr. O'Doan's diagnosis with the police before he was released into their custody." Moreover, he had no recollection "that the police brought Mr. O'Doan into the emergency room," nor "what happened when Mr. O'Doan was released from [his] care."

Certainly, Officer Leavitt's so-called "uncontradicted testimony" should be subject to cross-examination.

The majority also supports its grant of qualified immunity because "nothing required the officers to reach the further conclusion that O'Doan was in a post-ictal state when he engaged in the wrongful acts" since "Dr. DiRocco himself could not make that assessment." Although Dr. DiRocco did not have definitive knowledge of O'Doan's condition at the scene, he nonetheless was able to conclude from the hospital records that O'Doan had "an epileptic seizure." And he would so "testify before a judge." Clearly, the doctor's knowledge and the bases for his conclusion are matters for resolution by a jury.

O'Doan was charged under Nevada law with resisting arrest and indecent exposure – both of which require a culpable mental state. *See* Nev. Rev. Stat. § 1999.280.3 (Resisting a Public Officer) (requiring that the prohibited conduct be committed "willfully"); Nev. Rev Stat. § 201.220.1 (Indecent or Obscene Exposure); *Young v. State,* 109 Nev. 205, 215 (1993) (requiring "intentional" exposure to sustain a conviction under § 201.220); *Quiriconi v. State,* 95 Nev. 195, 196 n.3 (same). Wisely, better heads prevailed, and the charges were subsequently dropped.

## 2. Cross Examination

Here is a condensed version of questions I would ask Officer Sanford:

Q. Isn't it true that you signed the discharge papers at the hospital when you arrested O'Doan?

Q. Explain to the jury how you could have signed on the seventh page without having any knowledge of any of the information contained on the other pages?

Q. If you knew that those pages describe O'Doan as having suffered from a seizure, that they connect O'Doan's seizure activity to his broader epilepsy medical condition, and state that "[e]pilepsy is a brain disorder in which a patient has repeated seizures over time," would you still have agreed with Officer Leavitt that O'Doan should have been arrested?

Q. If so, why?

Q. Why was O'Doan arrested at the hospital and not at the scene?

Q. I assume you understand that the crimes for which O'Doan was arrested required that he acted intentionally?

Q. Since O'Doan was not arrested at the scene, why was he arrested at the hospital after he was diagnosed as having had an epileptic seizure and had been treated for his epilepsy?

A jury should be permitted to hear the answers to those questions – as well as being allowed to resolve all the other factual issues which permeate this entire record.

I have chosen to write a somewhat unconventional dissenting opinion to dramatize the value and importance of our jury system and that we should be circumspect in allowing judges to be factfinders. *See Jacob v. City of New York*, 315 U.S. 752, 752–53 (1942) ("The right of jury trial in civil cases at common law is a basic and fundamental feature of our system of federal jurisprudence which is protected by the Seventh Amendment. A right so fundamental and sacred to the citizen, whether guaranteed by the Constitution or provided by statute, should be jealously guarded by the courts."); Dale Broeder, *The Functions of the Jury: Facts or Fictions?* 21 U. Chi. L. Rev. 386, 388 ("The jury system also supposes that the judgment of twelve men whose differences are resolved through open-minded discussion is better than the judgment of [the judge]"). It hopefully will have the added virtue of serving as a cautionary tale that the concept of qualified immunity has its limits – especially in the sensitive area of alleged police misconduct.[4]

---

[4] Recent events have placed qualified immunity in the public spotlight. Judges and the public alike are criticizing what is perceived as

## III

It was also improper for the majority to grant summary judgment on O'Doan's ADA wrongful arrest claim. The Ninth Circuit recognizes ADA claims for arrests "where police wrongly arrest someone with a disability because they misperceive the effects of that disability as criminal activity." *Sheehan v. City of San Francisco*, 743 F.3d 1211, 1232 (9th Cir. 2014), *rev'd in part on other grounds*, *City of San Francisco v. Sheehan*, 575 U.S. 600 (2015).

The majority is correct that "O'Doan would need to "'prove intentional discrimination' and that "[t]his standard is met by a showing of 'deliberate indifference,' which 'requires both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that . . .

---

tantamount to an absolute bar on police accountability. *See* Hailey Fuchs, *Qualified Immunity Protection for Police Emerges as Flash Point Amid Protests*, N.Y. TIMES, Jun. 23, 2020, at A16 ("Once a little-known rule, qualified immunity has emerged as a flash point in the protests spurred by [George] Floyd's killing and galvanized calls for police reform."); *see also* Circuit Judge James A. Wynn Jr., *Opinion: As a judge, I have to follow the Supreme Court. It should fix this mistake.*, WASH. POST, Jun. 12, 2020, https://www.washingtonpost.com/opinions/2020/06/12/judge-i-have-follow-supreme-court-it-should-fix-this-mistake/ (Qualified immunity "prevents plaintiffs from pursuing their claims . . . and excuses ever more egregious conduct from liability"). Justice Sotomayor has criticized the ever-expanding doctrine of qualified immunity as "an absolute shield for law enforcement officers." *Kisela v. Hughes*, 138 S. Ct. 1148, 1162 (2018) (J. Sotomayor, dissenting) (finding the majority opinion "tells the public that palpably unreasonable conduct will go unpunished."). She aptly describes the Supreme Court's "unflinching willingness" to reverse denials of qualified immunity, while rarely intervening in wrongful grants of qualified immunity, as "gutting the deterrent effect of the Fourth Amendment." *Id*.

likelihood.'" (citing *Duvall v. City of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001)).

The "deliberate indifference" test is satisfied "[w]hen the plaintiff has alerted the public entity to his need for accommodation (or where the need for accommodation is obvious, or required by statute or regulation)." *Duvall*, 260 F.3d at 1139. Therefore, if the officers knew that O'Doan's conduct was a result of a seizure, O'Doan has a viable ADA wrongful arrest claim. Since the officers' knowledge is once again at the heart of the issue, summary judgment is inappropriate.

## IV

Finally, summary judgment is also inappropriate on O'Doan's § 1983 due process claim that Officers Leavitt and Sanford violated due process by not discussing O'Doan's reported seizure in their police report and supporting affidavit. The majority is correct that "O'Doan relies principally on *Devereaux v. Abbey*, 263 F.3d 1070 (9th Cir. 2001), which states that 'there is a clearly established constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government.'"

However, a jury could come to a different conclusion for a number of reasons. There are three police records at issue: (1) Officer Sanford's police report, (2) Officer Leavitt's police report, and (3) Officer Leavitt's arrest report. Initially, a jury may infer that the failure of the officers to include O'Doan's seizure diagnosis in their police reports – a diagnosis reached by Dr. DiRocco before O'Doan's arrest – was hardly benign. No one reading the police reports would have any clue of the circumstances surrounding the arrest.

Officer Leavitt's arrest report is likewise silent as to O'Doan's seizure. But there is an even clearer sign of intentional fabrication in this report. On the first page, Officer Leavitt reports that the "Offense Date" occurred at the scene at "1850" (6:50 pm), and that O'Doan was arrested there twelve minutes later at "1902" (7:02 pm). This was not true. And a jury certainly could conclude that Officer Leavitt knew it since he admitted in his sworn deposition that he arrested O'Doan two hours later at the hospital.

Based on this entire record, a jury could easily conclude, and certainly could infer, that the officers wanted to hide the ball to make this seem like an innocuous indecent exposure case, and that this falsehood was hardly unintentional.

## CONCLUSION

Accordingly, the district court's grant of summary judgment must be reversed with respect to O'Doan's false arrest, ADA wrongful arrest, and due process claims.