**NOT FOR PUBLICATION**
UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

**FILED**



SEP 10 2024

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| JENNIFER POWER, on behalf of herself, all statutory beneficiaries of decedent Monnie Washburn, and the Estate of Monnie Washburn,<br><br>        Plaintiff-Appellant,<br><br>  v.<br><br>STATE OF ARIZONA, a governmental entity; CORIZON HEALTH, INC., a Missouri corporation, doing business in the State of Arizona; CORIZON, INC., a Missouri corporation, doing business in the State of Arizona; CORIZON, LLC, a foreign limited liability company; CORRECT CARE SOLUTIONS, LLC, a foreign limited liability company doing business in Arizona; GEO GROUP, INC., a Florida Corporation doing business in Arizona; DALE A. KING, individually, Corrections Officer; ANTONIO R. TUCCINO, individually, Corrections Officer; STEVEN GALLARDO, individually, Sergeant,<br><br>        Defendants-Appellees. | No. 21-16436<br><br>D.C. No. 2:19-cv-01546-DLR<br><br>MEMORANDUM[*] |

Appeal from the United States District Court
for the District of Arizona
Douglas L. Rayes, District Judge, Presiding

---

[*] This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

Argued and Submitted November 7, 2023
Phoenix, Arizona

Before:  HAWKINS and COLLINS, Circuit Judges, and SEEBORG,[**] District Judge.

During a prisoner transport between the Arizona state prison in Kingman and the Arizona state prison in Tucson, an inmate named Monnie Washburn began to exhibit signs of medical distress.  This distress escalated over the course of the day, with Washburn losing consciousness and ultimately being pronounced dead shortly after the transport's arrival in Tucson.  Plaintiff-Appellant Jennifer Power, Washburn's widow, brought this suit under 42 U.S.C. § 1983 alleging, *inter alia*, that Defendants-Appellees Dale A. King, Antonio R. Tuccino, and Steven Gallardo—the corrections officers who were directly or indirectly involved in the prisoner transport—violated Washburn's Eighth Amendment rights.  Power also asserted one or more related state law claims against these three officers as well as against several additional Defendants, including the State of Arizona and various corporations involved in the operation of the relevant prisons.  Power's operative complaint also asserted that the Defendant corporations allegedly responsible for medical needs at the Tucson prison were liable for Washburn's death under § 1983.

The district court granted summary judgment on all of the federal claims and

[**] The Honorable Richard Seeborg, Chief United States District Judge for the Northern District of California, sitting by designation.

2

declined supplemental jurisdiction over the state claims.  Power timely appealed.

We have jurisdiction under 28 U.S.C. § 1291.  We reverse the summary judgment

dismissing Power's § 1983 claims against King, Tuccino, and Gallardo, and we

remand for further proceedings.

I

Because this appeal arises from a grant of summary judgment to Defendants,

we recite the facts in the light most favorable to Power and draw all reasonable

inferences in her favor.  *See O'Doan v. Sanford*, 991 F.3d 1027, 1035 (9th Cir.

2021).  Where one or more witnesses has offered conflicting testimony concerning

the same factual issue, we assume that the "version of events" that is more

favorable to Power "is true."  *Center for Bio-Ethical Reform, Inc. v. Los Angeles

Cnty. Sheriff Dep't*, 533 F.3d 780, 797 (9th Cir. 2008).

On June 20, 2017, King and Tuccino oversaw a roundtrip prisoner bus

transport between the state prison in Kingman and the state prison in Tucson.  At

any given time, one officer was responsible for driving the bus while the other was

responsible for supervising prisoners, which the officers were ordinarily permitted

to do only by observing the prisoners through a plexiglass barrier separating the

driver and passenger compartments.

The officers arrived at the Kingman prison around 10:00 AM and, while

loading prisoners onto the bus, they noted that it was very hot.  The bus embarked

3

for Tucson around 1:00 PM. At some point between Kingman and Wikieup, the prisoners began to complain about the heat inside the bus. Around this time, King, who was then in charge of monitoring the prisoners, noticed Washburn pacing, pulling at his restraints, and asking for water, but King later testified that he believed that other prisoners were egging him on.

The officers stopped at Wikieup to refuel the bus, but they decided to continue on to Wickenburg when a government credit card they attempted to use in Wikieup was refused. At this point, Michael Ballantyne, one of the other prisoners on the transport, as well as certain other prisoners, started to become more concerned about Washburn's condition. By the time the transport arrived in Wickenburg, it was apparent to Ballantyne that Washburn was suffering from heat exhaustion, as he was red and sweaty and saying things that made no sense. Ballantyne and the other prisoners told Tuccino that they believed Washburn would die without medical assistance.

While stopped at a gas station in Wickenburg, the officers entered the passenger compartment of the bus so that King could replenish the water supply that was available to the prisoners there. They also lowered the bus windows for better ventilation. At that time, King had an opportunity to observe Washburn directly. Because Washburn was disoriented, the other prisoners had to assist him when King ordered the prisoners to move away from the cooler. Prior to departing

4

Wickenburg, the officers changed roles, with King assuming the job of driving, and Tuccino that of monitoring the prisoners.

As the bus was pulling out of the gas station at Wickenburg, the prisoners observed Washburn seizing and vomiting on himself, and they informed Tuccino of that fact. Tuccino observed Washburn through the window separating the passenger compartment, and decided to call his supervisor, Gallardo, to ask for instructions on how to proceed. Gallardo asked Tuccino if he had witnessed the seizure, and Tuccino responded that he had not. Tuccino asked Gallardo whether to initiate an "Incident Command System" ("ICS"), a procedure whereby officers on scene can contact the Department of Corrections central office to request the assistance of available resources, including local law enforcement, whenever there is a medical emergency. Gallardo instructed Tuccino to continue to Tucson. Shortly after the first phone call, Tuccino observed Washburn vomit, and he called Gallardo a second time. Tuccino again asked whether to initiate an ICS and Gallardo again told him not to do so. Instead, Gallardo suggested that the transport be rerouted to a nearby prison facility in Perryville and stated that he would make plans to do so.

At this point, Gallardo placed a call to the Tucson prison, where he was put in touch with Nidia Salazar, a nurse employed in the medical facility. Gallardo informed Salazar that an inmate on the bus had vomited and appeared to be

5

severely dehydrated, and he asked what he should do. Salazar asked Gallardo to retrieve the inmate's information and informed a nurse practitioner of the situation. After Gallardo called back with Washburn's information, Salazar informed Gallardo that the Tucson facility would be ready to receive Washburn if the officers decided to bring him there. At no point did Salazar suggest to Gallardo that Washburn *should* be brought to Tucson, nor did Gallardo at any time mention to Salazar that Washburn had allegedly experienced a seizure. After the discussion with Salazar, Gallardo called Tuccino again and instructed him to keep proceeding to Tucson.

Washburn's condition continued to deteriorate over the remainder of the journey. Washburn had become unresponsive shortly after the transport's departure from Wickenburg. At some unspecified time after the stop in Wickenburg, Ballantyne hit Washburn to prove to Tuccino that Washburn was not faking his unresponsiveness. Ballantyne testified that, by the time the bus reached Casa Grande, Washburn had soiled himself and "had like no pulse," and the inmates laid him on the floor of the bus. Neither officer attempted to resuscitate Washburn at this point, nor did they provide any of the inmates with the resources to do so.

After Washburn vomited again and had been laid on the floor of the bus, Tuccino again called Gallardo to update him on Washburn's status and ask for

6

guidance. Gallardo again told the officers to keep going to Tucson. Shortly thereafter, the officers received a call from Gallardo's supervisor, Lieutenant Baker, whom Gallardo had informed of the situation. Baker instructed Tuccino to initiate an ICS, which he did, but by this point the transport was close enough to Tucson that the Department of Corrections central office simply dispatched a vehicle to escort the bus for the remainder of its journey. The bus arrived at the Tucson prison around 7:30 PM, where a medical team was waiting. The medical team removed Washburn from the bus and attempted to perform cardiopulmonary resuscitation on him before ultimately pronouncing him dead at the scene.

## II

We review the district court's grant of summary judgment de novo. *O'Doan*, 991 F.3d at 1035. "Under 42 U.S.C. § 1983, to maintain an Eighth Amendment claim based on prison medical treatment, an inmate must show 'deliberate indifference to serious medical needs,'" resulting in harm to the inmate. *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citation omitted). There is no dispute, for purposes of summary judgment, that Washburn had a "serious medical need." To establish that a given prison official acted with deliberate indifference, Power must show that the official was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]," and that the official "dr[e]w the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

7

Deliberate indifference is a high standard, and a mere showing of medical malpractice, negligence, or even gross negligence is not on its own sufficient to establish an Eighth Amendment violation. *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004) (citations omitted). Furthermore, a prison official who actually knows of a substantial risk to prisoner health or safety is not liable under the deliberate indifference standard if he or she "responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844. This "reasonable safety" standard incorporates "due regard for prison officials' 'unenviable task of keeping dangerous men in safe custody under humane conditions.'" *Id*. at 844–45 (citation omitted).

Government officials are entitled to qualified immunity "unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018) (citation omitted). "A right is clearly established when it is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)). For a right to have been "clearly established," it must have had a "sufficiently clear foundation" in precedent at the time of the challenged conduct. *Wesby*, 583 U.S. at 63. This typically means that then-existing precedent must have "clearly prohibit[ed] the

officer's conduct in the particular circumstances before him," *id.*, but general rules may suffice to clearly establish the illegality of an officer's action in an "obvious case," *Kisela v. Hughes*, 584 U.S. 100, 105 (2018) (citation omitted).

**III**

Applying these standards, we reverse the district court's grant of summary judgment to Gallardo. Gallardo's failure to assert a defense of qualified immunity means that the question whether to reverse the district court's grant of summary judgment in his favor does not hinge on whether any right that he may have violated was clearly established. Because a jury could reasonably find that Gallardo violated Washburn's Eighth Amendment rights, the district court erred in granting Gallardo summary judgment.

On the merits of Power's Eighth Amendment claim, Gallardo does not dispute that harm ultimately resulted from the failure to respond to Washburn's serious medical need. Rather, Gallardo argues that there is no genuine dispute as to whether he "knew of [the] substantial risk" to Washburn's health or "failed to act reasonably."

However, given the disputes in the record, a reasonable jury could find both that Gallardo was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" and also that he "dr[e]w the inference." *Farmer*, 511 U.S. at 837. Gallardo himself admitted that "heat stroke, seizures,

9

and heat exhaustion," or symptoms indicative of these, would all be medical emergencies warranting an ICS. And despite Gallardo's contention in his brief that he was only aware of "*some* medical need," rather than one severe enough to satisfy the Eighth Amendment standard, Gallardo also admitted that he was aware at the time of a "potential[] . . . medical emergency." A reasonable jury could find that Gallardo suggested diverting the transport to Perryville and contacted the ASPC-Tucson medical facility precisely because he had inferred a substantial risk to Washburn's health. And though Gallardo stated that he believed an "inmate report of a seizure would not be enough" to initiate an ICS on its own, a reasonable jury could find that the additional information that the officers provided, such as the fact that Washburn had vomited, was sufficient to give Gallardo notice of an "objectively intolerable *risk* of harm." *Id*. at 846 (emphasis added).

Gallardo further argues that, even if he did draw an inference of a substantial risk of serious harm to Washburn, he acted "reasonably" in responding to it. Gallardo contends that "[i]t is undisputed that the medical personnel with whom [he] consulted did not tell him to call an ICS, or to divert the bus . . . to the nearest hospital," and he claims that he acted "based on what qualified medical personnel were telling him." But in Salazar's conflicting account of their conversations, she did not give Gallardo any particular advice on what to do with Washburn, but simply informed Gallardo that the Tucson facility would make preparations to

10

receive Washburn if he ultimately arrived there. Thus, contrary to Gallardo's claim and the district court's conclusion, there is a genuine dispute of material fact as to whether Gallardo was acting on the advice of medical professionals. Furthermore, even if a jury found that Gallardo was acting on advice from Salazar, this would not automatically establish that it was reasonable for him to do so. If, for instance, a jury found that, as Salazar claimed, Gallardo omitted any mention of Washburn's possible seizure in his description of events, it would have been unreasonable for him to act on her half-informed advice.

As the disputes in the record discussed above permit a finding that Gallardo inferred a substantial risk of harm to Washburn and did not act reasonably in response, summary judgment is inappropriate. We therefore reverse the district court's grant of summary judgment to Gallardo.

**IV**

We also reverse the district court's grant of summary judgment to King and Tuccino. Unlike Gallardo, King and Tuccino have raised qualified immunity as an alternative ground for affirming the district court's grant of summary judgment to them. Accordingly, we must consider whether King and Tuccino violated Washburn's *clearly established* Eighth Amendment rights. Because qualified immunity is an "objective inquiry," the "qualified immunity inquiry should concentrate on the objective aspects of the constitutional standard," and that

11

remains true "even where the clearly established legal standard requires subjective deliberate indifference." *Sandoval v. County of San Diego*, 985 F.3d 657, 673 (9th Cir. 2021) (simplified). Accordingly, the relevant question is whether, "given the available case law at the time," any reasonable officer in King's and Tuccino's respective positions "would have understood that" their conduct "presented such a substantial risk of harm . . . that the failure to act was unconstitutional." *Horton ex rel. Horton v. City of Santa Maria*, 915 F.3d 592, 600 (9th Cir. 2019). Viewing the evidence and resolving all disputes in the light most favorable to Power, we conclude that this standard is met as to both officers.

Tuccino stated that, after witnessing Washburn vomit shortly after the bus departed Wickenburg, he called Gallardo and stated that he believed Washburn should be taken off the bus. King, who was the driver at the time of the calls to Gallardo, stated that he was aware Washburn had been acting strangely and had vomited. King was also aware, when Tuccino called Gallardo for the second time, that Washburn was in medical distress, and discussed with Tuccino the possibility of diverting the bus to the Perryville facility. King additionally stated that, after Gallardo talked with Salazar, Gallardo called Tuccino and told him that Washburn could be experiencing a heat-related injury. Furthermore, given Ballantyne's testimony, a reasonable jury could find that both Tuccino and King observed that Washburn was visibly disoriented as early as the stop in Wickenburg.

12

If this timeline is accurate, then any reasonable officer knowing what Tuccino and King in fact knew would have understood that proceeding to Tucson—which was still two-and-a-half to three hours away at the time Gallardo informed Tuccino of his conversation with Salazar—presented an intolerable risk to Washburn's safety. Although no precedent is directly on point, we think that—resolving all disputes in Power's favor—this is an "obvious case" in which general Eighth Amendment standards alone would have sufficed to provide King and Tuccino with notice as to the unconstitutionality of their behavior. *See Kisela*, 584 U.S. at 105 (citation omitted). Eighth Amendment deliberate indifference does not require that officers be aware of facts from which an inference of *certain* harm can be drawn—only a substantial risk. *See Horton*, 915 F.3d at 600. Any reasonable officer who knew that Washburn was experiencing signs of medical distress would not fail to respond for several hours when other options were readily available.

The risks inherent in prisoner transport and the officers' reliance on Gallardo's instructions do not change this outcome. Although, for instance, the officers "w[ere] aware . . . of instances where inmates had feigned illness or injury to facilitate escape," there is no suggestion in the record that dropping Washburn off at the Perryville prison or initiating an ICS would have posed any custodial risk beyond that of proceeding to Tucson. And though King and Tuccino's brief argues that acting differently would have meant "disregard[ing] their supervisor's lawful

13

orders," Gallardo's permission was not necessary for them to initiate an ICS, nor was there any reason to believe they would have been punished for exercising their discretionary authority to do so. We therefore reverse the district court's grant of summary judgment to King and Tuccino, and remand for further proceedings.

**V**

Power also seeks reversal of the summary judgment in favor of Defendants Corizon Health, Inc.; Corizon, Inc.; and Corizon, LLC (collectively, "Corizon"), on her § 1983 claim alleging that, as managers of prisoner healthcare for the Tucson prison, they are liable for Washburn's death. However, after Corizon filed its answering brief, Corizon Health, Inc. filed for Chapter 11 bankruptcy, and this court accordingly stayed proceedings as to Corizon. The Clerk of Court administratively closed this appeal as to Corizon on July 10, 2023, and no party has since notified this court of any change to the automatic stay's effect on this appeal or moved to reopen the appeal as to Corizon. No mandate will issue as to Corizon in connection with this administrative closure, and the Clerk's July 10, 2023 order remains in effect.

**REVERSED AND REMANDED IN PART AND STAYED IN PART.**